FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 JUL 25 PM 4:28

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| LEE SHEPHERD, SR., as Administrator of the Estate of LEE SHEPHERD, JR., deceased; and JESSE J. SHEPHERD,  Plaintiffs  VS.  MICHELIN TIRE CORPORATION,  Defendant | CIVIL ACTION NO.  92-AR-0089-S |

ENTERED

JUL 25 1997

### MEMORANDUM OPINION

The court has already notified counsel in the above-entitled case of its intention to grant the motion in limine filed by defendant, Michelin Tire Corporation ("Michelin"), seeking to preclude the testimony of Dr. Kenneth Laughery ("Laughery") proffered by plaintiffs, Lee Shepherd, Sr., as Administrator of the Estate of Lee Shepherd, Jr., deceased, and Jesse J. Shepherd ("the Shepherds"). Because plaintiffs thereupon informed the court that they cannot realistically proceed without Laughery's testimony and that the court's ruling is tantamount to the granting of a motion by Michelin for judgment as a matter of law, the jury trial that had been scheduled to begin on July 21, 1997, was cancelled. It is now incumbent on the court both to explain its reasons for excluding the testimony of Laughery and to provide the Shepherds a

1

127

vehicle by which they may obtain an appellate review of the court's conclusion.

The court begins by confessing that it has mixed emotions and finds the issue presented a bothersome one. Even without this confession, it would be unfair in the extreme to deny the Shepherds an opportunity to seek from the Eleventh Circuit its opinion as to whether this court's findings and conclusions are "manifestly erroneous" and/or that this court has abused the broad discretion granted it in Rule 702, F.R.E., as interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993). *See Hibiscus Assoc. Ltd. v. Board of Trustees of Policemen and Firemen Retirement Sys.*, 50 F.3d 908, 917 (11th Cir. 1995).

This court conducted a so-called *Daubert* hearing with respect to Laughery's proposed testimony. At that hearing the court received evidence from both sides, including live testimony from Laughery. Pursuant to Rule 104(a), F.R.E., the court received relevant information that would be hearsay but for the relaxed rules for admission under pre-trial consideration. The court also had available and has considered as evidence for *Daubert* purposes those portions of the materials offered in support of and in opposition to Michelin's earlier motion for summary judgment to the extent deemed relevant to the current inquiry. The issue of Laughery's entitlement to express the opinions plaintiffs elicited from him at the *Daubert* hearing was orally explored with very

competent counsel. This court, known, it hopes, for its sincere belief in the continued viability of the Seventh Amendment, only once before in fifteen years on the bench here closed the gate on proposed expert testimony in advance of trial while acting as "gatekeeper." That one occasion was in *Courington v. American Republic Insurance Co.*, CV 90-AR-0710-S, a pre-*Daubert* case in which this court waxed exuberant if not eloquent in stopping an "expert" from expressing what this court there found to be a far-fetched opinion. Michelin could not resist the temptation to cite this court's *Courington* opinion to this court. It can be found under Tab "M" of its Exhibit 1 offered during the *Daubert* hearing. *Courington* was a unique case, distinguishable from the instant case in which the court finds the gatekeeper role to be more difficult than in *Courington*. With more reluctance than it had in *Courington* the court nevertheless closes the gate on Laughery's testimony.

If this judge had been on the Supreme Court when *Daubert* was written, he would have joined Chief Justice Rehnquist and Justice Stevens, who, while concurring in part and dissenting in part, said:

> The various briefs filed in this case are markedly different from typical briefs, in that large parts of them do not deal with decided cases or statutory language--the sort of material we customarily interpret. Instead, they deal with definitions of scientific knowledge, scientific method, scientific validity, and peer review--in short, matters far afield from the expertise of judges. This is not to say that such materials are not useful or even necessary in deciding how Rule 703 should be applied; but it is to say that the unusual subject matter should cause us to proceed

with great caution in deciding more than we have to, because our reach can so easily exceed our grasp.

But even it if were desirable to make "general observations" not necessary to decide the questions presented, I cannot subscribe to some of the observations made by the Court. In Part II-B, the Court concludes that reliability and relevancy are the touchstones of the admissibility of expert testimony. *Ante*, at 2795-96. Federal Rule of Evidence 402 provides, as the Court points out, that "[e]vidence which is not relevant is not admissible." But there is no similar reference in the Rule to "reliability." The Court constructs its argument by parsing the language "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, ... an expert ... may testify thereto ...." Fed.Rule Evid. 702. It stresses that the subject of the expert's testimony must be "scientific ... knowledge," and points out that "scientific" "implies a grounding in the methods and procedures of science" and that the word "knowledge" "connotes more than subjective belief or unsupported speculation." *Ante*, at 2795. From this it concludes that "scientific knowledge" must be "derived by the scientific method." Ibid. Proposed testimony, we are told, must be supported by "appropriate validation." Ibid. Indeed, in footnote 9, the Court decides that "[i]n a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*." *Ante*, at 2795, n. 9 (emphasis in original).

Questions arise simply from reading this part of the Court's opinion, and countless more questions will surely arise when hundreds of district judges try to apply its teaching to particular offers of expert testimony. Does all of this *dicta* apply to an expert seeking to testify on the basis of "technical or other specialized knowledge"--the other types of expert knowledge to which Rule 702 applies--or are the "general observations" limited only to "scientific knowledge"? What is the difference between scientific knowledge and technical knowledge; does Rule 702 actually contemplate that the phrase "scientific, technical, or other specialized knowledge" be broken down into numerous subspecies of expertise, or did its authors simply pick general descriptive language covering the sort of expert testimony which courts have customarily received? The Court speaks of its confidence that federal judges can make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Ante*, at 2796. The Court then states that a "key question" to be answered in deciding whether something is "scientific knowledge" "will be whether it can be (and

4

has been) tested." Ibid. Following this sentence are three quotations from treatises, which speak not only of empirical testing, but one of which states that the "'criterion of the scientific status of a theory is its falsifiability, or refutability, or testability.'" Ante, at 2797.

I defer to no one in my confidence in federal judges; but I am at a loss to know what is meant when it is said that the scientific status of a theory depends on its "falsifiability," and I suspect some of them will be, too.

I do not doubt that Rule 702 confides to the judge some gatekeeping responsibility in deciding questions of the admissibility of proffered expert testimony. But I do not think it imposes of them either the obligation or the authority to become amateur scientists in order to perform that role. I think the Court would be far better advised in this case to decide only the questions presented, and to leave the further development of this important area of the law to future cases.

*Daubert*, 113 S. Ct. at 2799, 2800 (Rehnquist, J. and Stevens, J., concurring in part and dissenting in part.)

Because this court is bound by what the majority said in *Daubert*, which makes a lot of sense despite the caveats expressed by the concurring dissenters, it becomes necessary for this court to make findings of fact pertinent to and that justify the non-admissibility of Laughery's testimony. *United States v. Lee*, 25 F.2d 997, 999 (11th Cir. 1994). The facts pertinent to the issue are these.

### Pertinent Facts

This action arose from an accident that occurred when deceased, Lee Shepherd Jr., was mounting and inflating a 16 inch Michelin tire on a mismatched 16.5 inch rim. Everybody concerned admits that this mismatching is very dangerous. Other potential

5

tire mismatches are immediately obvious and less dangerous because the tire simply won't fit on the rim, whereas this particular mismatch appears to "fit" or "mount" but usually, if not invariably, fails to "seat." The inflation of this particular smaller tire on the larger rim causes the tire to explode, often with deadly force. This is an industry wide problem that has led to enough complaints of injury and death to alert tire manufacturers (and perhaps tire fitters) to the danger. *See Richards v. Michelin Tire Corp.*, 21 F.3d 1048 (11th Cir. 1994).

On the day of this accident a customer of Harris Tire & Car Wash in Birmingham brought his Michelin tires to be mounted. The tire in question contained on its sidewall an instruction that it, a 16-inch tire, should only be mounted on a 16-inch rim. There were no other warnings or instructions on the tire. Lee Shepherd, Jr. and his uncle, Jesse Shepherd, who apparently knew that such tires should not be mounted on mismatched rims, attempted to affix and inflate the tire on a 16.5-inch rim. The tire exploded, causing injuries to Lee Shepherd, Jr., resulting in his death, and injuring Jesse Shepherd.

Laughery is a professor of psychology at Rice University. His academic credentials are impeccable. Among other impressive academic achievements, he holds the Ph.D. degree. He studies, writes and testifies about the theory of human factors related to warnings. He proposes in this case to testify (1) that this

particular Michelin tire did not have an adequate warning; (2) that persons who encounter the "hazard" inherent in the subject mismatch do not have sufficient "hazard awareness" to avoid accidents; and (3) that the chances of averting this accident would have been increased if Laughery's proposed or "candidate" warning had been affixed to the tire. If there is such a person as an "expert" in "communications theory" and "ergonomics," Laughery is such a person. He is certainly a highly articulate, intelligent and learned professional. He is just as certainly not a charlatan. To the contrary, he is a person of integrity to match his skill. In fact, well before *Daubert* was decided Laughery actually testified as a "warnings" expert before a jury in a case presided over by this very judge. He there expressed his opinion in regard to the increased likelihood of injury as the result of the absence of a particular warning. The Eleventh Circuit in that case in a split decision found that the absence of Laughery's suggested warning provided an adequate evidentiary basis for the jury to conclude, as it did, that his warning, if it had been present, would likely have averted the accident. While this court there allowed Laughery's testimony, it later granted defendant's motion for j.n.o.v. after the jury returned a verdict against defendant for having failed to provide an adequate warning. Judge Godbold dissented, agreeing with this court's grant of j.n.o.v. and with this court's belief in a lack of substantive evidence to link the failure to warn with the

7

accident. *See Gean v. Cling Surface Company*, 971 F.2d 642 (11th Cir. 1992), *rehearing and rehearing en banc denied*. *Gean*, it must be remembered was decided without the guidance provided by *Daubert*.

On the specific subject of "warnings" Laughery has written three scholarly articles. Two of his articles contain empirical studies as to the effectiveness of warnings placed on copy machines, telephones, water fountains, and broken doors, and warnings in chemical experiments. These articles did not conclude that warnings about proscribed conduct, such as drinking from an allegedly contaminated water fountain, <u>always</u> work. However, they did adduce concrete evidence that certain types of warnings, if placed in strategic locations, can have a salutary effect, or that certain combinations of warnings can be effective in favorably altering behavior. Even so, it apparently is the generally held belief in the field, based on empirical studies, that warnings quite often fail to modify potentially dangerous behavior. Laughery's papers, testimony *ore tenus* in the instant case, and by deposition all acknowledge this fact. Even so, he and his co-authors state, "[w]hile we would agree that there is little evidence to support the contention that warnings are effective, we disagree with the conclusion that the evidence shows they are not." This is a beautiful inverse reasoning, but unpersuasive use of language can add no weight to the Shepherds' case.

8

Laughery's third article, which directly bears on the problem with 16-inch tires and 16.5-inch rims, was premised not on empirical data, but rather is the product of a study of the evidence in 13 separate litigated cases in which persons were injured or killed as the result of inflating a 16-inch tire on a 16.5-inch rim. As a result of studying the evidence from these cases, Laughery concludes that there is a need for more elaborate and more eye-catching warnings on 16-inch tires than are currently being used. This particular tire contained an "instruction" or a "warning", depending on how it is classified, stating "MOUNT ONLY ON APPROVED 16 INCH RIMS." The tire inflating device used by the Shepherds to attempt the mismatch contained a separate "warning." It said: "<u>VERIFY</u> THAT TIRE AND RIM SIZES ARE PROPERLY MATCHED."

Michelin's expert, Dr. Neil Robinson ("Robinson"), like Laughery a Ph.D. with impeccable credentials, set out to test Laughery's suggestion that a well-designed label will improve safety if accompanied by a comprehensive instructional system. Laughery's proposed comprehensive system would include, for example, posters and pamphlets describing the potential danger of inflating tires on mismatched rims. Robinson's study involved the actual use of Laughery's proposed warning on 16-inch tires in the real world. Persons conducting Robinson's study attempted to have service station attendants inflate 16-inch tires containing Laughery's proposed warning on mismatched 16.5-inch rims. This

9

empirical adventure produced the fact that personnel at 11 of 12 service stations actually attempted to inflate such tires, completely ignoring the warning. The study adduced no evidence to show that *any* of the service station attendants who inflated the tires paid any attention whatsoever to Laughery's warning. The one station that refused to inflate the tire did so because a manager recognized the 16-inch tire as not appropriate for inflation on a 16.5-inch rim. This manager refused to inflate the tire based on his personal knowledge and not on the warning, which he did not notice. It is obvious, as Laughery admits, that in order to be effective, a warning must first be noticed, then understood, then heeded. The Robinson study, based on field testing, concluded that Laughery's warning had no practical effect, one way or the other. The warning on the tire, standing alone without the rest of the instructional package, including posters and pamphlets, logically is less effective than if the danger is emphasized from many angles. For instance, a flashing red neon sign on a tire, if such is theoretically possible, would probably prevent the mismatching problem, at least as long as the electric current is not interrupted or the neon tube defective, but such a warning would, of course, be impractical. The totality of the evidence bearing on this particular hazard is entirely consistent with research in the "warning" field, namely, the research that concludes that warnings are not particularly effective behavior modifiers. It may be

10

worth noting, also, that as a matter of behavior pattern males and experienced persons are more likely to ignore warnings than females or novices. The two persons here injured were experienced males. Robinson's study did reflect that some "tire busters" who actually attempted to inflate the 16-inch tires on the 16.5-inch rims used procedures that arguably would have made these dangerous attempts less dangerous. It is unknown if any of these safety procedures were employed by the Shepherds, although some evidence would suggest that they were not.

Laughery recognizes that factors such as cost of compliance, familiarity with the product, hazard perception, ease of instructions, task load, training and gender are all factors that affect a warning's effectiveness. Further, Laughery recognizes the principle that a warning overload devalues whatever warnings are on a dangerous product. Laughery concedes, as he must, that he has conducted no field testing to support his theoretical conclusions which are based on his academic and practical experience in dealing with human behavior. He acknowledges that the Robinson study constitutes the only empirical testing directly relating to a warning's effectiveness in modifying the specific behavior at issue here. Laughery further agrees with the assertion that there "is no empirical data that supports [his] opinion that any particular sidewall warning will make tires safer because there's been no testing, jurying, or test marketing of any particular sidewall

warnings."

The bottom line of Laughery's testimony is his understandable inability or unwillingness to state with any degree of certainty that _if_ his proposed warning system had been used by Michelin at the time of this accident, the accident probably would not have occurred. When asked to hypothesize _all_ of the facts present at the time of this accident, plus the assumed fact of his warning scheme in place, he would not say that the probability that this accident would _not_ have occurred would have been by 50% or more. In other words, Laughery's testimony does not meet the preponderance test on proximate causation, even if he were allowed to testify. The number of possible variables bearing on the outcome of the Shepherd scenario are myriad. For instance, whether the mistake first occurs with the person who starts the procedure or with the person who actually mounts the tire, or with the person who subsequently inflates the tire, the effectiveness of a warning differs. It would take much more empirical data even than Robinson provides to ascertain with any degree of scientific accuracy what real decrease in effectiveness a progress "entrapment" scenario would have on the ultimate outcome of a prospective mismatched inflation.

Laughery proffers no expert opinion on the ultimate issue of fact under Rule 704, F.R.E., and for good reason. He recognizes that he is not allowed to speculate, the mark of an honest man.

Honesty is the best policy, but it sometimes gets in the way of successful advocacy.

## Conclusions of Law

In this court's opinion the Shepherds' best argument is one they do not make, namely, that by affirming this court's earlier denial of Michelin's motion for summary judgment addressed to the Shepherds' "failure to warn" theory, as distinct from its defective design theory, the Eleventh Circuit is on record as holding that the Shepherds make out a jury case on "failure to warn." This court concedes that the failure to warn issue previously addressed by this court and by the Eleventh Circuit under Rule 56, F.R.Civ.P. analysis bears some resemblance to the issue now addressed under Rules 104(a) and 702, F.R.E., but the issues are different in crucial respects. This court does not concede that it is flipflopping when it looks through the *Daubert* prism instead of under the Rule 56 magnifying glass. It might have been possible to conduct a *Daubert* analysis at the Rule 56 stage, but the court was not called upon to do it and did not do it.

Michelin takes the position that the court's gatekeeper role, described and elaborated in *Daubert*, prohibits Laughery's testimony and stops the Shepherds in their tracks because there is no real data upon which Laughery bases or can base any reasonable and reliable conclusion that will fairly assist a jury. *See*

13

*Weinstein's Federal Evidence*, 2d Ed., § 703.05[2][C](1997). Michelin further points out that the <u>only</u> empirical study on the fact question at hand leads to a conclusion opposite from the inconclusive conclusion that Laughery reaches. If the *Daubert* court was less than perfect in articulating the gatekeeper function, it did make clear that the trial judge has an inescapable obligation to determine whether proffered expert testimony in a particular case is "scientific" and whether the proffered expert's "knowledge" will assist the trier of fact. *Daubert*, 113 S. Ct. at 2795. To fulfill this obligation the court must determine that the proposed expert's testimony must be both "reliable" and "relevant."

This court is impressed by and agrees with the exposition of the *Daubert* case found in the two opinions of Chief Judge Rambo of the Middle District of Pennsylvania in *In re TMI Litigation Cases Consolidated II*, 911 F. Supp. 715 and 910 F. Supp. 200 (M.D. Pa. 1996). Using Judge Rambo's exegesis of *Daubert* this court finds that Laughery's testimony is not "scientific" and therefore not "reliable." As the Eleventh Circuit said in its very recent *U.S. v. City of Miami, Florida*, 115 F.3d 870, 873 (11th Cir. June 20, 1997):

> Relevant expert testimony is admissible only if an expert knows of <u>facts</u> which enable him to express a reasonably accurate conclusion.

(emphasis supplied). This opinion was written by Judge Godbold, who dissented in *Gean, supra*, and in which the majority held, pre-

14

*Daubert*:

> Gean himself testified that he was unaware of the danger of being pulled to the nip point from where he stood, three to four feet away. (citation omitted). Further, Dr. Laughery testified that Gean could not have understood the biomechanical forces created by the belt in question.
>
> * * *
>
> With regard to proximate causation, the Geans bore the burden of proving that: (1) Diamond Shamrock would have read the warning and bought a grooved pulled instead of the smooth one involved in the accident, and Gean's injuries would thereby have been avoided.
>
> * * *
>
> [M]r. Dennis Weber, the maintenance superintendent at Diamond Shamrock at the time of the accident, testified that he would have obeyed an instruction about the correct application of the smooth pulley. Mr. Weber also gave testimony from which a reasonable juror could infer that the smooth pulley would not have been purchased if Weber had been warned that more than routine maintenance would be required to keep it working properly. Moreover, the expert testimony given by both Dr. Muster and Dr. Laughery supported the reasonable inference that, had a grooved pulley been used, Gean's injuries would have been averted.

971 F.2d at 645, 646. With or without *Daubert*, and despite *Gean*, this court cannot allow Laughery to testify that the Shepherds "could not have understood the biomechanical forces created by the [tire and rim] in question." Neither could this court allow Jesse Shepherd to testify "that he would have obeyed a more prominent instruction on the tire about the danger of the mismatch." But *Daubert* has now been decided and is law of the Eleventh Circuit, as well as the law of all other circuits. It wipes *Gean* off the books.

Laughery's proposed testimony may be "reliable" in the sense

that he is an intelligent and sincere witness. These personal traits do not, however, add up to the "reliability" intended by *Daubert*. It is obvious that there is a gray area in which the gatekeeper must often operate. Where a theory is untested except by having submitted it to comment by other professors, it is not thereby elevated to the degree of "reliability" that an empirically tested theory reaches. This court is unwilling to make a sharp distinction between physical science and social science for *Daubert* purposes but does note that it is easier to drift into speculation where the social sciences are implicated. In this case Laughery carefully refused to speculate, a fact which leads the court to the second inquiry, namely, whether his proposed testimony is <u>relevant</u>.

One of the *Daubert* tests requires a trial court to examine the rate of error in the testing methodology. Here there were no "tests" except those conducted by the Robinson team, and Laughery himself does not say that the degree of effectiveness of his warning scheme would exceed 50% in cases such as this one. Simply concluding, as is reasonable, that a more prominent warning would decrease the danger, although plausible, does not make such a conclusion "relevant" in a case in which the burden is upon plaintiffs to prove proximate causation by a preponderance of the evidence. Michelin correctly cites *Yarbrough v. Sears, Roebuck and Co.*, 628 So. 2d 478, 482 (Ala. 1993), for the proposition that "a negligent-failure-to-warn case cannot be submitted to a jury unless

16

there is some evidence that the allegedly inadequate warning would have been read and heeded and would have kept the accident from occurring." The mere fact that the majority in the pre-*Daubert* *Gean* found the existence of such evidence does not mean that Laughery, the same witness who testified in *Gean* can supply such evidence in this case. *Daubert* now stands in the way. The classic question in medical malpractice cases is a perfect analogy. There is that famous distinction between "It could have made a difference" and "It is highly probably that it would have made a difference."

    An appropriate, separate order will be entered.

    DONE this 25th day of July, 1997.

                                               /s/ William M. Acker, Jr.
                                               WILLIAM M. ACKER, JR.
                                               UNITED STATES DISTRICT JUDGE